IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TOKYO OHKA KOGYO AMERICA, INC.,**<br><br>           Plaintiff,<br><br>     v.<br><br>**HUNTSMAN PROPYLENE OXIDE LLC**,<br><br>        Defendant. | Case No. 3:13-cv-01580-SI<br><br>**OPINION AND ORDER** |

Bruce H. Cahn and Peter S. Hicks, BALL JANIK LLP, 101 S.W. Main Street, Suite 1100, Portland, OR 97204; Kimberly A. Donovan, GCA LAW PARTNERS LLP, 2570 W. El Camino Real, Suite 510, Mountain View, CA 94040. Of Attorneys for Plaintiff.

Philip S. Van Der Weele and Stephanie E. L. McCleery, K&L GATES LLP, One S.W. Columbia Street, Suite 1900, Portland OR 97258; Bruce A. Blefeld and Edward W. Duffy, K&L GATES LLP, 1000 Main Street, Suite 2500, Houston, TX 77002. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Tokyo Ohka Kogyo America, Inc. ("TOK") asserts a claim for breach of contract against

Huntsman Propylene Oxide LLC ("Huntsman"). TOK purchased a chemical manufactured by

Huntsman and alleges that Huntsman breached its agreement to notify TOK in a timely fashion if

Huntsman changed its chemical manufacturing process. The parties agreed to litigate this case in

phases and further agreed that "Phase 1" of the litigation would encompass only whether the

PAGE 1 – OPINION AND ORDER

limitation of liability clause contained in Huntsman's general terms and conditions of sale that were attached to the Credit Application that TOK executed with Huntsman applies to limit TOK's potential damages in this action. The parties cross-move for summary judgment on this Phase 1 question. For the reasons stated below, the Court finds that the limitation of liability clause is not enforceable under Uniform Commercial Code ("UCC") Section 2-719 and thus does not limit TOK's damages in this lawsuit. Accordingly, TOK's motion for partial summary judgment is GRANTED, and Huntsman's motion for partial summary judgment is DENIED.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)

(quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

The parties stipulated to many facts for purposes of the pending cross-motions for partial summary judgment. Additional background facts are taken from the record.

TOK is in the business of sourcing, qualifying, mixing, manufacturing, selling, and delivering chemicals for use in the semiconductor manufacturing process. Huntsman makes and supplies certain chemicals. In 2008, TOK was purchasing propylene glycol ("PG"), a chemical that TOK combined with other chemicals to create a mixture that TOK then sold to its semiconductor manufacturing customer ("Customer"). The Customer was engaged in a pilot test to determine if it wished regularly to use the chemical mixture that included PG.

TOK originally sourced PG from a supplier who purchased it from Huntsman. TOK then wished to explore purchasing PG directly from Huntsman. On or about June 5, 2008, Huntsman requested that TOK sign a Credit Application with Huntsman, and TOK did so. TOK's Vice

PAGE 3 – OPINION AND ORDER

President, Michael Lindsay, and Deputy General Manager-Operations, Chris Carlson, signed

Huntsman's Credit Application on behalf of TOK. Lindsay and Carlson had authority to do so.

    A one-page document entitled "Huntsman General Terms and Conditions of Sale"

("Huntsman General Terms") was attached to the Credit Application signed by TOK.

Immediately above the line for TOK's signature, the Credit Application stated:

> THE SIGNATORY BELOW HEREBY ATTESTS
> APPLICANT'S FINANCIAL RESPONSIBILITY, ABILITY
> AND AGREEMENT TO PAY ALL SUMS PROPERLY DUE
> AND OWING PURSUANT TO HUNTSMAN INVOICES. IN
> CONSIDERATION FOR HUNTSMAN'S AGREEMENT TO
> EVALUATE APPLICANT'S CREDITWORTHINESS,
> APPLICANT HEREBY ACKNOWLEDGES RECEIPT OF AND
> AGREES THAT ANY PURCHASE BY APPLICANT OF
> HUNTMAN [*sic*] PRODUCTS WILL BE MADE PURSUANT
> TO THE GENERAL TERMS AND CONDITIONS GOVERNING
> SALE ATTACHED HERETO.
>
> THE ABOVE INFORMATION IS PROVIDED BY APPLICANT
> FOR THE PURPOSES OF OBTAINING CREDIT AND IS
> WARRANTED TO BE TRUE, CORRECT AND COMPLETE.
> APPLICANT HEREBY AUTHORIZES HUNTSMAN TO
> INVESTIGATE THE INFORMATION AND TRADE AND
> BANK REFERENCES LISTED ABOVE PERTAINING TO
> APPLICANT'S CREDIT AND FINANCIAL RESPONSIBILTY.
> ALL DECISIONS MADE BY HUNTSMAN WITH RESPECT
> TO THE EXTENSION, CONTINUATION OR
> DISONTINUATION OF CREDIT TO APPLICANT SHALL BE
> MADE PURSUANT TO HUNTSMAN'S DISCRETION.

(capitalization in original). The attached Huntsman General Terms include a limitation of

liability clause ("Limitation Clause"), stating, in relevant part:

> LIMITATION OF LIABILITY. Seller's maximum liability for any
> breach of this Agreement, or any other claim related to the
> Product, shall be limited to the purchase price of the Product or
> portion thereof (as such price is set forth on the first page of
> Seller's invoice) to which such breach or claim pertains. IN NO
> EVENT SHALL SELLER BE LIABLE FOR ANY
> CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE
> DAMAGES, INCLUDING BUT NOT LIMITED TO ANY

DAMAGES FOR LOST PROFITS OR BUSINESS
OPPORTUNITIES OR DAMAGE TO REPUTATION.

(capitalization in original).

When Lindsay and Carlson signed the Credit Application, they believed that the Credit

Application and its reference to general terms and conditions related to TOK's financial

responsibility; they did not believe that the referenced general terms and conditions created any

limitations of liability or other contractual terms governing sales that may occur at some point in

the future and they did not read the Huntsman General Terms attached to the Credit Application.

Carlson and Lindsay reviewed TOK's responses on the Credit Application to make sure that

TOK's financial and other information as stated on the completed form was accurate, and they

then signed the form. No one at Huntsman discussed with Carlson or Lindsay the Huntsman

General Terms generally or the Limitation Clause specifically until after this litigation

commenced.

The Credit Application was not itself a contract for the purchase or sale of PG. Although

Lindsay and Carlson had the authority to sign a credit application, at the time that they signed the

Credit Application, neither of them had the authority to execute a sales contract. The Huntsman

General Terms were not separately signed by Lindsay or Carlson.

After Huntsman approved TOK's creditworthiness, the parties engaged in discussions

regarding TOK's potential purchase of PG from Huntsman. TOK informed Huntsman that the

PG that TOK was purchasing would be mixed with other chemicals and that the final mixture

would be sold to the Customer for use in making semiconductors. TOK also informed Huntsman

that any potential purchase of PG from Huntsman would depend on Huntsman and the PG

meeting TOK and the Customer's approval process, which included reaching an agreement on

product and process specifications and inspection and approval of the Huntsman plant. In

approximately August 2008, TOK made its first purchase of a sample lot of PG from Huntsman.

Between August 2008 and July 2010, TOK purchased four additional sample lots to test the

efficacy of the PG in the chemical mixture.

Every time that TOK purchased PG from Huntsman, TOK sent a purchase order that

stated that all purchases were subject to TOK's terms and conditions. Each time that Huntsman

shipped PG to TOK, Huntsman included a sales invoice that specified the quantities and prices

for the PG being shipped and attached the Huntsman General Terms. These two sets of

documents contain different terms, but for purposes of the pending motions, Huntsman does not

contend that the Huntsman General Terms attached to the invoices sent to TOK are binding or

enforceable.

Because of the precise and demanding nature of the Customer's manufacturing needs and

processes, the Customer insisted on the right to approve all suppliers, vendors, chemicals, and

components involved in its supply chain. TOK and Huntsman engaged in lengthy negotiations

regarding the specifications of the PG, and TOK worked with the Customer to get Huntsman

approved as a vendor. In May or June 2010, TOK inspected and audited Huntsman's

manufacturing facility. In August 2010, TOK and Huntsman agreed to an initial written

procurement specification for the manufacture and sale of PG from Huntsman to TOK. This

procurement specification included a "Process Change Notification" clause that required

Huntsman to notify TOK twelve months in advance of implementing any change in the

manufacturing process.[1]

---

[1] Although neither party placed the 2010 procurement specification contract in the record, the parties stipulated at oral argument that the 2010 procurement specification contract contained a Process Change Notification clause with the same or materially similar language to the Process Change Notification clause in the September 2011 procurement specification contract.

On or about September 23, 2011, TOK and Huntsman agreed to the written Procurement Specification for E-Grade Propylene Glycol (the "2011 Procurement Specification"). The 2011 Procurement Specification contains a "Process Change Notification" clause stating:

> When there is a process change in the production of the product, the supplier shall send notification. This notification will be given twelve months in advance of implementation. Shorter advance notice will require negotiated approval between the supplier and TOK AMERICA. Process changes include changes in raw material suppliers, the manufacturing process, and other significant changes affecting the quality of the product.

The 2011 Procurement Specification also contains a "Non-conforming Materials" clause that states that if an abnormality is discovered in the quality of the PG during its use, TOK and Huntsman shall consult together to determine appropriate actions and that product shipped to TOK that is out of specification will be returned to Huntsman and replaced. This clause was later modified by an addendum stating:

> After reviewing TOK America's Procurement Specification for Propylene Glycol, it is noted that these specifications are more stringent than we [Huntsman] can meet. Huntsman is willing to accept the return of non-conforming material for credit. However, the credit will be limited to the amount that Huntsman can recover by selling the product to another customer.

The 2011 Procurement Specification was not in itself a contract for the purchase or sale of PG.

TOK tested every shipment of PG upon arrival from Huntsman in order to identify any PG that did not meet the agreed-upon specifications before TOK mixed it with other chemicals. Additionally, the chemical mixture was tested to ensure that it was within the specifications demanded by the Customer, and the Customer engaged in additional quality control and sampling throughout its semiconductor manufacturing process.

On or about October 9, 2012, the Customer reported to TOK that semiconductor wafers were demonstrating defects well above acceptable levels. The Customer, TOK, and Huntsman

then worked together to identify the specific issue and concluded that the PG was the problem. It was then discovered by TOK that an undisclosed processing change made by Huntsman modifying temperature and pressure conditions caused an unidentifiable chemical change during the manufacture of the PG. Accordingly, although the PG met the technical specifications set forth in the 2011 Procurement Specification and was able to pass TOK's own tests, the PG used in the mixture sent by TOK to the Customer caused defects to appear in the Customer's semiconductor manufacturing process. For purposes of the pending cross-motions only, Huntsman concedes that it changed its manufacturing process and failed to comply with the Process Change Notification clause in the 2011 Procurement Specification.

As soon as the problem was identified to TOK, it stopped mixing the Huntsman-supplied PG with other chemicals and stopped ordering PG from Huntsman. By that time, however, TOK already had made a significant amount of the chemical mixture containing the defective PG and had additional, unmixed PG still in its possession. The unmixed PG was sold, and the proceeds are in Huntsman's counsel's trust account. The mixed chemicals, however, required hazardous waste disposal. TOK spent significant sums transporting the defective PG and defective chemical mixture to and from various locations, purchasing chemicals that were mixed with the defective PG and thereby rendered unusable, mixing the defective PG with other chemicals, and hiring hazardous waste disposal companies to dispose of the defective chemical mixture.

## DISCUSSION

TOK makes several arguments as to why Huntsman's Limitation Clause is unenforceable in this case: (a) it fails of its essential purpose and is unenforceable under UCC Section 2-719(2); (b) it is unconscionable and unenforceable under UCC Section 2-719(3); (c) it is inconspicuous; (d) it is an invalid contractual provision because it was not bargained-for, there was no meeting of the minds, and it is ambiguous; and (e) it does not apply to the 2011 Procurement

PAGE 8 – OPINION AND ORDER

Specification, which is the specific contract that was allegedly breached. Because the Court finds

that the Limitation Clause fails of its essential purpose and is unconscionable under UCC Section

2-719, the Court does not address TOK's remaining arguments.

## A.  Choice of Law

TOK argues that the Huntsman General Terms do not apply to this case and that TOK's

general terms apply; thus, TOK argues that Oregon law applies as set forth in TOK's general

terms. Huntsman argues that the Huntsman General Terms do apply and, thus, that Texas law

applies as set forth in the Huntsman General Terms. Both parties agree, however, that the choice

of law does not matter because both jurisdictions have adopted the relevant sections of the UCC

and there are no material differences between how Oregon law and Texas law interpret those

provisions. The Court also notes that both Oregon and Texas law look to the decisions of other

jurisdictions when interpreting the UCC. *See, e.g.*, *Peace River Seed Coop., Ltd. v. Proseeds

Mktg., Inc.*, 355 Or. 44, 53 (2014) ("In addition, 'the legislative intent to make the UCC a

uniform code makes relevant the decisions of other courts that have examined these questions

and the discussions of the questions by scholars in the field, especially those scholars who

participated in drafting the UCC.'" (quoting *Sec. Bank v. Chiapuzio*, 304 Or. 438, 445 n.6

(1987))); *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 391 (Tex. 2011)

(relying on the decisions of other jurisdictions and noting that "[t]he UCC should be construed to

promote uniformity with other jurisdictions").

The Court resolves the pending cross-motions for partial summary judgment under UCC

Section 2-719.[2] Accordingly, for purposes of the pending motions, the Court need not reach the

---

[2] The Court refers to and quotes the uniform provisions for Section 2-719. This Section is codified in Texas as Tex. Bus. & Commercial Code § 2.719 and in Oregon as Or. Rev. Stat. § 72.7190.

issue of which law applies and looks to the law in Oregon, Texas, and other jurisdictions in analyzing the enforceability of the Limitation Clause under these sections of the UCC.

## B.  Framework For Limiting Remedies and Damages Under UCC Section 2-719

Section 2-719 of the UCC establishes that parties may agree to limit the measure of damages available for a breach of contract and may limit the available remedies, subject to certain conditions. This section provides:

> (1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,
>
> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
>
> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.
>
> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

U.C.C. § 2-719. The official comments to this provision further clarify the ability of parties to limit remedies and the check on that ability created by Section 2-719(2)-(3), stating:

> 1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.
>
> However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to

conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

2. Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.

3. Subsection (3) recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable manner. Actually such terms are merely an allocation of unknown or undeterminable risks. The seller in all cases is free to disclaim warranties in the manner provided in Section 2-316.

In addition, courts have explained Section 2-719(2) in the following terms:

"The exclusive remedy provision is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties . . . . Although an arm's length contract between sophisticated commercial parties, such as in this case, should not be readily upset by a court, where a party is deprived of the substantial value of its bargain by reason of the exclusive remedy, the contract remedy will give way to the general remedy provisions of the U.C.C."

*Viking Yacht Co. v. Composites One LLC*, 2007 WL 2746713, at *5 (D. N.J. Sept. 18, 2007)

("*Viking I*"), *aff'd*, 385 F. App'x 195 (3d Cir. 2010) ("*Viking II*") (quoting *BOC Group v. Chevron Chem. Co.*, 359 N.J. Super. 135, 147 (N.J. Super. Ct. App. Div. 2003)); *see also*

*Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App. 1986) (noting that

"where an apparently fair and reasonable limitation because of circumstances fails in its purpose

or operates to deprive a party of the substantial value of the bargain, the limited remedy must give way to the general remedy provisions of the code").

## C.  A Remedy Limitation Failing of its Essential Purpose Under UCC Section 2-719(2)

Courts struggle with defining what it means for a limited remedy to "fail of its essential purpose." Conceptually, cases invoking Section 2-719(2) are more easily analyzed when they involve a repair-or-replace remedy for a specific product, because it can more readily be determined that the product is not as promised, has not been sufficiently repaired or replaced, and thus the remedy has failed of its purpose. The analysis is more nuanced when a refund remedy is at issue, although courts have found that a refund remedy can also fail of its essential purpose, such as when a seller conceals relevant facts or there is a latent defect. *See Arias/Root Eng'g v. Cincinnati Milacron Mktg. Co.*, 1991 WL 190114, at *5 (9th Cir. 1991) (listing cases).[3]

Comment 1 to Section 2-719 offers guidance on how to analyze whether a remedy limitation fails in its essential purpose. Understanding that the word "its" refers to the remedy limitation, Comment 1 instructs that when a limitation "fails in its purpose or *operates to deprive*

---

[3] Huntsman argues that under Texas law, only a repair-or-replace remedy can fail of its essential purpose because no Texas case has found a failure of essential purpose for a refund remedy. This argument is unavailing. Texas courts have not rejected the applicability of the failure-of-essential-purpose limitation to refund remedies—the issue simply has not yet come before Texas courts. Huntsman cites to no case, Texas or otherwise, finding that refund remedies cannot fail of their essential purpose. Huntsman cites only to *Global Octanes Tex., L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521 (5th Cir. 1998). Huntsman's reliance on *Global Octanes* for this proposition is misplaced. *Global Octanes* did not address UCC Sections 2-719(2) or (3), but merely quoted from a non-UCC Texas case for the unremarkable proposition codified in UCC Section 2-719(1)—that parties can limit their remedies even if the limitation is not a reasonable estimate of probable damages. The fact that parties can limit their remedies as set forth in Section 2-719(1), however, does not insulate parties from the requirements of Sections 2-719(2) or (3). To the contrary, Section 2-719(1) expressly states that limitations are subject to Sections 2-719(2) and (3). Nothing in the language of Section 2-719(2) supports the notion that refund remedies may not fail of their essential purpose, and the Court believes that Texas courts would find that refund remedies can fail of their essential purpose, at least under the right circumstances. The key is identifying these circumstances.

*either party of the substantial value of the bargain*, it must give way to the general remedy

provisions of this Article." (emphasis added). Courts analyzing whether limiting a remedy to a

refund of the purchase price fails of its essential purpose generally focus on the requirement that

a party should not be deprived of "the substantial value of the bargain" as opposed to otherwise

defining what it means for a limitation to fail in its purpose.[4] Additionally, many courts note that

if a case involves a latent defect that is not discoverable upon reasonable inspection, then a

limitation, including a limitation to a refund of the purchase price, necessarily fails of its

essential purpose.[5]

The determination under Section 7-219(2) of whether "circumstances [have] cause[d] an

exclusive or limited remedy to fail of its essential purpose" or whether the limitation has

"operate[d] to deprive[] either party of the substantial benefit of the bargain" requires

consideration of the bargain made at the time the contract was entered into and whether, after

breach and based on the circumstances of the breach, the limitation is operating to deprive either

party of that bargain. A court should attempt to discern the essential purpose of the exclusive or

limited remedy when it was first agreed-upon by the parties—the bargain of the parties with

respect to their allocation of risks and remedies. *See Held v. Mitsubishi Aircraft Int'l*, 672 F.

---

[4] *See, e.g.*, *Viking II*, 385 F. App'x at 208; *BAE Sys. Info. & Elecs. Sys. Integration, Inc. v. SpaceKey Components, Inc.*, 941 F. Supp. 2d 197, 206-07 (D. N.H. 2013); *OZ Gen. Contracting Co. v. Timesavers, Inc.*, 2012 WL 4344500, at *3 n.3 (E.D.N.Y. Sept. 21, 2012); *Lincoln Elec. Co. v. Technitrol, Inc.*, 2010 WL 2219341, at *4-5 (N.D. Ohio June 2, 2010).

[5] *See, e.g.*, *Viking II*, 385 F. App'x at 208; *Advanced Tubular Prods., Inc. v. Solar Atms., Inc.*, 149 F. App'x 81, 85 (3d Cir. 2005); *Arias/Root*, 1991 WL 190114, at *5 (listing cases); *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427, 432 (6th Cir. 1983) (listing cases); *Marr Enters., Inc. v. Lewis Refrig. Co.*, 556 F.2d 951, 955 (9th Cir. 1977); *BAE Sys.*, 941 F. Supp. 2d at 213; *Barnext Offshore, Ltd. v. Ferretti Group USA, Inc.*, 2012 WL 1570057, at *10 (S.D.Fla. May 2, 2012); *Lincoln Elec.*, 2010 WL 2219341, at *4-5 (listing cases); *Cox v. Lewiston Grain Growers, Inc.*, 936 P.2d 1191, 1198 (Wash. Ct. App. 1997); *Neville Chem. Co. v. Union Carbide Corp.*, 294 F. Supp. 649, 655 (W.D. Pa. 1968), *aff'd in part and rev'd in part on other grounds*, 422 F.2d 1205 (3d Cir. 1970).

Supp. 369, 382 (D. Minn. 1987) (noting that a court should "first determine what the bargain was before deciding whether any party has been deprived of it") (citing Jonathan A. Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719(2)*, 65 Cal. L. Rev. 28, 33 (1977) (hereinafter "Eddy, *Metaphysics*")). The Court should not concern itself, at least under Section 7-219(2), with whether the agreed-upon limitation on remedy was wise, fair, or oppressive at the time of contract formation, but simply ask what was the limitation's essential purpose at that time.

A court must also focus on the circumstances surrounding the alleged breach of contract and resulting harm to discern whether the harm is one caused by novel circumstances not contemplated by the parties and involved a risk not allocated by the parties. *See Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 709 (9th Cir. 1990) ("The task before the district court was to examine the remedy provisions and determine whether Selas's default caused a loss which was not part of the bargained-for allocation of risk."); *Viking I*, 2007 WL 2746713, at *5 ("The exclusive remedy provision is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties."); James J. White & Robert S. Summers, *Uniform Commercial Code*, § 13:20 (6th ed. 2010) (same). Where the circumstances involved were foreseeable by the parties, at least as a possibility, and the risk was allocated, the limitation on remedy properly can be seen to reflect the parties' agreed-upon allocation of anticipated risks. Where the circumstances surrounding the alleged breach of contract and resulting harm were not part of the bargained-for allocation of risk, then one party has been deprived of the substantial value of its bargain, the limitation on remedy fails of its essential purpose, and Section 7-219(2) operates to void that limitation.

This case involves a latent defect that was not discoverable upon reasonable inspection.[6] The mere existence of such a latent defect, however, does not end the Court's analysis. It may be that the parties bargained for an allocation of risk relating to latent defects. Accordingly, the Court looks to the bargain between the parties, including determining the bargained-for allocation of risk and whether it included allocating the risk for the type breach committed by Huntsman and the type of latent defect that occurred. *See Held*, 672 F. Supp. at 382 ("The crucial question is whether the parties were knowingly allocating risks of latent or undiscoverable design defects to the purchaser after the expiration of the warranty period, or whether the eventuality of a design defect represents 'novel circumstances not contemplated by the parties.'") (citation omitted); *see also Milgard*, 902 F.2d at 709.

Huntsman argues that the presence of the boilerplate Limitation Clause in the Huntsman General Terms that was attached to the Credit Application signed by TOK is evidence that the parties intended to allocate all risks to TOK, including the risk of an undiscoverable defect caused by an undisclosed change in the manufacturing process, notwithstanding Huntsman's contractual obligation timely to disclose any such changes. Huntsman's argument is without merit.

The generic Limitation Clause was attached to a Credit Application that was signed more than two years before the parties entered into a significant commercial relationship and signed their first specification contract.[7] The Limitation Clause was not discussed or specifically and

---

[6] For purposes of the pending cross-motions only, the parties have stipulated that there was a latent defect.

[7] The generic Limitation Clause was also not brought to the attention of TOK. Although the Court is not conducting an analysis of whether the Limitation Clause was conspicuous, as discussed below in the Court's analysis of unconscionability, the Court is concerned with the procedural aspects of Huntsman purporting forever to bind TOK to a purchase-price remedy

expressly bargained-for at the time the Credit Application was signed by TOK. During the two years after TOK's execution of the Credit Application, the parties engaged in extensive negotiations on specifications, five test purchases to ensure the PG would work in TOK's chemical mixture and the Customer's semiconductor manufacturing process, and an approval process with the Customer. TOK also inspected and audited Huntsman's plant and manufacturing process.

After this lengthy process, the parties then signed specification contracts that more specifically defined the parties' obligations and their allocation of risk. Only then did TOK begin to make larger volume purchases. The 2011 Procurement Specification (as amended) expressly allocated the risk of discoverable defects to TOK by providing that if the PG did not meet TOK's specifications then TOK would only be entitled to a refund of the amount, if any, that Huntsman received after reselling the rejected PG. Both the 2010 and 2011 specification contracts also required Huntsman to provide twelve months' notice of any changes in its manufacturing process because a manufacturing change might affect the efficacy of the PG and not otherwise be discoverable by TOK in its inspection and testing.

There is no evidence that in June 2008, when TOK signed the Credit Application, incorporating by reference the Huntsman General Terms, the parties consciously intended that the Limitation Clause would allocate the risk to TOK of an undiscoverable defect caused by Huntsman's breach of its obligation timely to notify TOK of any change in Huntsman's manufacturing process. To the contrary, this type of allocation could not possibly have been intended at that time because Huntsman's obligation to notify TOK of any change in the manufacturing process did not even arise until the 2010 specification contract. Additionally,

through a document attached to a Credit Application, without regard to future negotiations and risk allocation and without ever calling TOK's attention to the Limitation Clause in that location.

during the two years that the parties engaged in testing and incremental orders and during the negotiations for the 2010 and 2011 specification contracts, the Limitation Clause was never mentioned. Notably, when Huntsman limited TOK's remedy for nonconforming goods in the 2011 Procurement Specification to only the amount for which Huntsman could resell the PG, thereby amending the Limitation Clause, Huntsman still failed to call TOK's attention to the fact that Huntsman believed the parties' relationship was governed by the Limitation Clause, that the Limitation Clause was being only partially amended, or that Huntsman believed the Limitation Clause remained otherwise in effect for any breach by Huntsman other than selling PG to TOK that did not meet TOK's technical specifications.

The facts here are on point with the "extreme case of imbalance between the parties' relative ability to avoid the specific risk in issue" discussed at length in Eddy, *Metaphysics*, *supra*, at 52-57, in addressing the *Neville Chemical* case. TOK, like Neville Chemical, "very conscious of bearing [the] risk [of nonconforming goods], appropriately limited its exposure by a slow process of testing and incremental orders. Only after the completion of a thorough risk assessment did" TOK agree to larger volume purchases. Eddy, *Metaphysics*, *supra* at 55. Additionally, as in *Neville Chemical*, if the PG, "with no change in its composition, later proved defective, [TOK] alone would have borne the risk." *Id.* The Court agrees with Professor Eddy's conclusion that "[t]he risk that the contract did not place upon [purchaser], however, was that [seller] would change its production process without notice, potentially rendering [purchaser's] extensive testing useless." *Id.* at 56. Notably, the facts in this case are more compelling than those in *Neville Chemical* analyzed by Eddy, because Eddy only inferred from the contract in that case that Union Carbide should have provided notice to Neville Chemical if it changed its

manufacturing process, whereas in this case there is an express contractual provision requiring Huntsman to notify TOK if Huntsman changes its manufacturing process.

The parties stipulate that they have entered into multiple agreements and that there are multiple documents that relate to the manufacture and sale of the PG by Huntsman to TOK, including the Credit Application, purchase orders sent by TOK, invoices sent by Huntsman, and the 2010 and 2011 technical specification contracts. These documents show that the bargain of the parties included the following allocations of risk: (1) TOK assumes the risk if there is no change in the manufacturing process, the PG complies with TOK's technical specifications, and the Customer's product later fails; (2) TOK assumes the risk if there is no change in the manufacturing process, the PG fails to comply with TOK's technical specifications, TOK still uses the PG in the mixture, and the Customer's product later fails; (3) TOK assumes the risk of losing some of its purchase price if the PG does not comply with TOK's technical specifications and TOK returns the PG to Huntsman, because TOK is only entitled to whatever amount Huntsman obtains in reselling the PG; (4) TOK assumes the risk if Huntsman timely discloses any change in its manufacturing process, TOK uses the PG, and the Customer's product later fails; but (5) TOK does *not* assume the risks created by Huntsman failing timely to disclose a change in its manufacturing process because this information is within the sole knowledge of Huntsman and TOK has no way of discovering any latent defects caused by a change in Huntsman's manufacturing process, thereby rendering the two years of testing useless. Such a breach was a novel circumstance not contemplated by the parties in 2008 when TOK signed the Credit Application.

There is a debate both in the case law and in the academic commentary about whether a seller's "good faith" is relevant to the analysis under Section 2-719(2). Many courts have

concluded that a seller's good faith and due care will not be sufficient to save a limitation on remedy that otherwise fails of its essential purpose. Few courts, however, ask whether a seller's "bad faith" is relevant to this analysis. In comparison, however, some courts have held that a buyer's misbehavior, such as conduct that deprives the seller of the chance to repair or replace a nonconforming product or conduct in which a buyer has made unauthorized modifications to a product before asking the seller to make repair, is relevant to whether a limited remedy fails of its essential purpose. By the same reasoning, it would not be inappropriate to consider a seller's misbehavior in deciding whether a limited remedy fails of its essential purpose. Here, TOK was willing to assume certain inherent risks in accepting Huntsman's PG, and the parties did not agree that Huntsman would be a guarantor for the success of TOK's efforts. There is no indication, however, that TOK was willing to assume the risk of Huntsman's misbehavior, (indeed, Huntsman's arguable "bad faith") in intentionally failing to comply with its contractual obligation timely to inform TOK of changes in Huntsman's manufacturing process, of which only Huntsman could be aware and control.

Because the Court finds that TOK and Huntsman did not allocate to TOK the risk of an unknown, latent defect caused by Huntsman's breach of its obligation timely to notify TOK of a change in manufacturing, the Court also finds persuasive the reasoning of cases that find that refund-only remedies fail of their essential purpose when there are latent defects that were only discovered after the defective product was either integrated into something else or was otherwise put to use in a way that rendered it non-returnable, thus resulting in significantly greater damages than the original purchase price. *See, e.g.*, *Viking I*, 2007 WL 2746713, at *6; *Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 836-37 (Colo. Ct. App. 1988). The court in *Viking I* found that because the product at issue, a gel coat, was "combined into a larger product before

use" and the purchaser could not "simply re-purchase gel coat from a different company and use it" but must instead engage in expensive remediation measures that were exponentially greater than the purchase price, the refund remedy failed of its essential purpose and provided a severely inadequate remedy. *Viking I*, 2007 WL 2746713, at *6. Similarly, the court in *Leprino* found that a provision limiting the plaintiffs' remedy to the purchase price failed of its essential purpose when the seller's breach was detectable only after the bricks were installed, requiring significant expense in removing and rebuilding the structure they had built with the defective brick. The court found that "[w]hen the parties agreed to limit the buyers' remedy to refund of the purchase price, they contemplated a situation in which the defective bricks would be returned to [the seller] prior to installation and the purchase price would be returned to the plaintiffs." *Leprino*, 759 P.2d at 837.

Parties may allocate the risk of an unknown latent defect on a buyer and limit damages, even when the limitation results in an inadequate remedy. *See e.g.*, *Global Octanes Tex., L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521 (5th Cir. 1998) (relying on UCC Section 2-719(1) for the proposition that parties to a contract can limit their damages and that "'it is immaterial whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach'" (quoting *Vallance & Co. v. DeAnda*, 595 S.W. 2d 587, 590 (Tex. App. 1980) (a non-UCC case))); Eddy, *Metaphysics*, 65 Cal. L. Rev. at 47-48 (noting that parties should be able to allocate the risk of loss for both discoverable and undiscoverable defects). Such a limitation is, however, subject to the requirements of UCC Section 2-719 that the remedy not fail of its essential purpose and that the limitation not operate in an unconscionable manner. U.C.C. §§ 2-719(2)-(3).

As discussed above, in this case there is no evidence that TOK and Huntsman intended to allocate the risk to TOK of a latent defect caused by Huntsman's breach of its obligation timely to notify TOK of any manufacturing process change. The evidence is that TOK was not aware of the Limitation Clause and intended and agreed to the limited remedy of a return of the purchase price, or even less than the purchase price, for nonconforming goods because TOK could test the delivered PG to ensure that it conformed to TOK's technical specifications and return nonconforming goods before using them. TOK attempted to reduce the risk of undetectable defects in the PG by taking two years to ensure that the PG and Huntsman's manufacturing process resulted in a workable chemical mixture and by requiring Huntsman timely to notify TOK of any change in Huntsman's manufacturing process. As in *Viking I* and *Leprino*, the undetectable defect, caused by information solely in Huntsman's possession and avoidable solely by Huntsman, resulted in significantly greater damages than the purchase price of the PG. These damages include transporting the defective PG and defective chemical mixture, the cost of the chemicals that were mixed with the defective PG and rendered unusable, and the cost of the hazardous waste disposal of the defective chemical mixture. Limiting TOK to damages of only the purchase price of the PG does not provide a "fair quantum of remedy" for Huntsman's breach of its obligation timely to notify TOK of any manufacturing change of which only Huntsman would be aware.

Whether a limitation fails of its essential purpose is generally an issue of fact for the jury. *See, e.g.*, *Demorato v. Carver Boat Corp.*, 304 F. App'x 100, 102 (3d Cir. 2008) (noting that whether a remedy failed of its essential purpose is "typically a question of fact for the jury"); *Arias/Root*, 1991 WL 190114, at *3 (noting that "the question of whether a remedy has failed 'is ordinarily a question of fact for the jury'") (citation omitted); *Xerox Corp. v. Graphic Mgmt.*

*Servs. Inc.*, 959 F. Supp. 2d 311, 320 (W.D.N.Y. 2013) (noting that whether a remedy has failed of its essential purpose is "generally" a question of fact for the jury). Here, however, the parties have stipulated to certain facts, and these facts establish as a matter of law that the Limitation Clause fails of its essential purpose under the circumstances presented because it deprives TOK of the substantial value of both its bargain regarding risk allocation and its bargain obligating Huntsman timely to notify TOK of any change in Huntsman's manufacturing process. Accordingly, the Court finds that the Limitation Clause fails of its essential purpose and grants TOK's motion for partial summary judgment on the issue that the limitation to a remedy of only the purchase price of the PG is unenforceable.

## D.  Consequential Damages Limitations Under UCC § 2-719(3)

In addition to limiting TOK's remedies for a breach of contract by Huntsman to only the purchase price of the PG, the Limitation Clause also contains a limitation avoiding consequential and incidental damages. TOK asserts that the limitation barring consequential and incidental damages automatically fails because the exclusive purchase price remedy fails of its essential purpose, and, in the alternative, fails because the damages limitation is unconscionable. Deciding whether a damages limitation is unconscionable is an issue of law for the Court, and the burden of proof is on the party alleging unconscionability. *Royston, Rayzor, Vickery & Williams, L.L.P. v. Lopez*, --- S.W.3d ---, 2013 WL 3226847, at *1 (Tex. App. June 27, 2013); *Or. Bank v. Nautilus Crane & Equip. Corp.*, 683 P.2d 95, 104 (Or. Ct. App. 1984).

Courts are divided as to whether a limitation on consequential damages is automatically unenforceable when an exclusive remedy limitation is found to fail of its essential purpose. Many courts find that if the remedy limitation fails of its essential purpose then the buyer may receive any remedy available under the UCC, including consequential damages, notwithstanding that consequential damages also may have been specifically excluded under the contract. *See,*

*e.g.*, *Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619, 625 (3d Cir. 1990) (applying

Wisconsin law); *Newmar Corp. v. McCrary*, 309 P.3d 1021, 1026 (Nev. 2013) (applying Nevada

law); *Hydronic Energy, Inc. v. Rentzel Pump Mfg., LP*, 2013 WL 5797326, at *6 (Neb. Ct. App.

Oct. 29, 2013) (applying Nebraska law); *Sutphen Towers, Inc. v. PPG Indus., Inc.*, 2005 WL

3113450, at *13 (Ohio Ct. App. Nov. 22, 2005) (applying Ohio law and relying on *Goddard v.

Gen. Motors Corp.*, 396 N.E.2d 761 (Ohio 1979)). Other courts, however, find that a contractual

waiver of consequential damages, particularly if it is in a separate clause from the exclusive

remedy limitation, survives a remedy limitation failing of its essential purpose and requires a

separate analysis of unconscionability. *See, e.g.*, *Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*,

635 F.2d 1081, 1086 (3d Cir. 1980) (applying New Jersey law); *Razor v. Hyundai Motor Am.*,

854 N.E.2d 607, 618-19 (Ill. 2006) (applying Illinois law); *Schurtz v. BMW of N. Am., Inc.*, 814

P.2d 1108, 1112-13 (Utah 1991) (applying Utah law). Finally, some courts take a case-by-case

approach and look at the circumstances in the particular case "to determine whether the exclusive

remedy and damage exclusions are 'separable elements of risk allocation' or 'inseparable parts

of a unitary package of risk-allocation.'" *Milgard*, 902 F.2d at 708 (quoting *Fiorito Bros., Inc. v.

Fruehauf Corp.*, 747 F.2d 1309, 1315 (9th Cir. 1984) (applying Washington law)).

Neither Oregon nor Texas state courts have addressed the issue of whether when an

exclusive remedy provision fails of its essential purpose a consequential damages exclusion also

necessarily fails. There are cases in the appellate courts of each state, however, that suggest that

those courts may read such clauses dependently, such that if an exclusive remedy fails of its

essential purpose, consequential damages may be recovered even if otherwise excluded under the

contract. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd.*, 146 S.W. 3d 79, 101 (Tex.

2004) (holding in a case where an exclusive remedy provision also contained a waiver of

consequential damages that where the remedy fails of its essential purpose "all damages provided by the UCC [become] available," without conducting a separate analysis of unconscionability on the limitation of consequential damages); *Young v. Hessel Tractor & Equip. Co.*, 782 P.2d 164, 167 (Or. Ct. App. 1989) (noting in a case where there was a separate consequential damages limitation that if a buyer could prove that the limited remedy fails of its essential purpose, then all remedies under the UCC would become available); *but see Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.*, 2005 WL 6792280, at *10 (S.D. Tex. Sept. 30, 2005), *rev'd in part on other grounds by* 2005 WL 3371875 (S.D. Tex. Dec. 12, 2005) (deciding as an issue of first impression under Texas law that Texas state courts would analyze exclusive remedy provisions and consequential damage waivers independently, without discussing *PPG Industries*). The Court, however, need not reach the issue of whether Texas or Oregon would find that a consequential damages limitation automatically fails if an exclusive remedy provision fails of its essential purpose because the Court finds that under the circumstances of this case, the consequential damages limitation operates in an unconscionable manner and is unenforceable, even if it survives the exclusive remedy provision failing of its essential purpose and is analyzed independently.

Most cases analyze unconscionability under UCC Section 2-302, which expressly involves unconscionability of a contract "at the time it was made." U.C.C. § 2-302(1). UCC Section 2-719(3), however, does not include the specific language included in Section 2-302 that unconscionability under 2-719(3) be at the time the contract was made. To the contrary, Section 2-719(3) "makes it clear that [clauses limiting consequential damages] may not *operate* in an unconscionable manner." U.C.C. § 2-719 cmt. 3 (emphasis added). A provision does not "operate" in an unconscionable manner at the time of formation. Thus, for purposes of analyzing

unconscionability under Section 2-719(3), the Court is not limited to evaluating the provision at the time the contract was made, but must consider how the provision operated and evaluate the provision after the contract has been breached.

Under both Texas and Oregon law, an agreement may be procedurally or substantively unconscionable. Generally speaking, procedural unconscionability refers to the circumstances surrounding the adoption of the provision at issue and substantive unconscionability concerns the fundamental fairness of the provision itself. *See In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002); *Bagley v. Mt. Bachelor, Inc.*, 310 P.3d 692, 702-04 (Or. Ct. App. 2013).

### 1. Procedural Unconscionability

Under Oregon law, procedural unconscionability focuses on the factors of oppression and surprise. *Bagley*, 310 P.3d at 702. Oregon courts explain these factors as:

> Oppression exists when there is inequality in bargaining power between the parties, resulting in no real opportunity to negotiate the terms of the contract and the absence of meaningful choice. Surprise involves the question whether the allegedly unconscionable terms were hidden from the party seeking to avoid them.

*Livingston v. Metro. Pediatrics, LLC*, 227 P.3d 796, 806 (Or. Ct. App. 2010) (citation omitted). Procedural unconscionability may also involve deception, compulsion, or genuine lack of consent. *Id.*

Under Texas law, procedural unconscionability is similarly analyzed, with courts considering factors such as:

> (1) the presence of deception, overreaching, and sharp business practices by part of the stronger party; (2) the absence of a viable alternative; (3) the relative acumen, knowledge, education, and financial ability of the parties involved; (4) knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; and (5) knowledge of the stronger party that the weaker party is unable reasonably to protect his interests.

*U.S. v. Reed*, 2014 WL 462620, at *10 n.18 (N.D. Tex. Feb. 5, 2014). A court must consider all of the circumstances surrounding the formation of the contract with respect to the allegedly unconscionable provision, including the parties' bargaining process, the conspicuousness of the provision, whether the buyer was on notice of the limitation, and whether each party had a reasonable opportunity to understand the language at issue. *See Head v. U.S. Inspect DFW, Inc.*, 159 S.W. 3d 731, 748 (Tex. App. 2005) (a court "must consider the entire atmosphere in which the agreement was made" and "must look at the bargaining process the parties went through"); *Berge Helene, Ltd. v. GE Oil & Gas, Inc.*, 830 F. Supp. 2d 235, 271, 274 (S.D. Tex. 2011), *superseded in part on other grounds*, 896 F.Supp.2d 582 (S.D. Tex. 2012) (noting when evaluating the unconscionability of an exclusion on consequential damages that courts "must look to the circumstances surrounding the agreement," that damages limitations are generally upheld "where there is evidence that the buyer was notice of the limitation" and that "courts often consider the degree of conspicuousness or whether a buyer had actual knowledge of a damages limitation in determining whether it is enforceable").

Here, considering the factors relevant to both Oregon and Texas's evaluation of procedural unconscionability, the Limitation Clause is unenforceable under both states' analysis.

### a.  The presence of deception, overreaching, or sharp business practices

This is an unusual, perhaps *sui generis* case, in which a boilerplate damages limitation is attached to a Credit Application without any bargaining or discussion, without the seller calling the buyer's attention to the clause, and after the execution of which more than two years of sample purchases and extensive testing are conducted, the manufacturing process is inspected and audited by the buyer, additional contracts are extensively negotiated, including another damages limitation clause, and the seller breaches an expressly negotiated clause in a manner that was solely within the seller's knowledge and ability to avoid the resultant harm.

Although parties to a contract are presumed to have read its terms, *see Philadelphia Indem. Ins. Co. v. White*, 421 S.W.3d 252, 262 (Tex. App. 2013); *Placencia v. World Sav. Bank, FSB*, 2011 WL 2460921, at *8 (D. Or. May 12, 2011), the Court has serious concerns about Huntsman's attaching to a Credit Application a purportedly far-reaching damages limitation clause governing all future sales between the parties without drawing TOK's attention to the clause.[8] These concerns are compounded by the fact that Huntsman negotiated with TOK for more than two years, including specifically negotiating another damages limitation clause, and yet still failed to mention the Limitation Clause to TOK. Then, when Huntsman changed its manufacturing process that had been extensively vetted by TOK, which Huntsman knew could alter the chemical makeup of the PG and result in the chemical no longer performing as required and which Huntsman knew it was required to disclose, Huntsman failed to disclose the manufacturing change to TOK. Under the circumstances of this case, this is a sufficient presence of deception, overreaching, or sharp business practice to rise to the level of unconscionability.

Analogously, where the seller knows of a latent defect and fails to disclose it to the buyer, any limitations may be unconscionable. *See Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, 2012 WL 1570057, at *10 (S.D. Fla. May 2, 2012). Here, although Huntsman did not know about the specific defect in the PG, Huntsman knew that it had changed its manufacturing process, knew that knowledge of a change in its manufacturing process was essential to TOK, and failed to disclose that manufacturing change to TOK. Under these circumstances,

---

[8] This case does not involve an explicitly-titled "Master Agreement," which some manufacturer's use to govern all transactions with buyers. "Master Agreements" are contracts with general terms entered into at the beginning of a commercial relationship, and it is readily apparent to all parties that they govern all future transactions. Often, future purchase orders or sales invoices expressly reference the Master Agreement.

Huntsman's failure to disclose the known manufacturing change renders the Limitation Clause unconscionable.

### b.   Surprise, conspicuousness, notice, and the parties' bargaining process

Huntsman's failure meaningfully to communicate the Limitation Clause to TOK is also fatal to the enforceability of the clause in these circumstances. The Limitation Clause was inconspicuous and unfairly surprising to TOK. This aspect of the pending dispute is similar to the dispute in *Berge Helene*, in which a seller did not "meaningfully communicate" a damages limitation that was included in a data sheet provided to the buyer. 830 F. Supp. 2d at 274. As summarized by the court in the Southern District of Texas:

> Unlike in most commercial contexts where the parties expressly allocate risk and negotiate terms of the contracts containing damages limitations, there is no evidence that [buyer] and [seller] treated the [data sheet] as a contract after negotiating each of its terms. Indeed, there is no evidence whatsoever that [seller] or any person brought the disclaimer to [buyer's] attention.

*Id.* (denying the seller's motion for summary judgment regarding the damages limitation because there was an issue of fact as to whether the damages limitation was procedurally unconscionable). As in *Berge Helene*, TOK and Huntsman did not negotiate any of the terms of the Huntsman General Terms, including the Limitation Clause, and Huntsman did not bring the Limitation Clause to TOK's attention. Instead, Huntsman remained silent for years, and now attempts to enforce a provision to avoid paying damages for harm that only Huntsman could have avoided. In these circumstances, TOK was not provided effective notice, and enforcing the Limitation Clause would result in unfair surprise.

### c.   Huntsman's knowledge of TOK's inability to receive the benefit of the bargain and protect itself

Although the parties are both commercial entities with roughly equal bargaining power and business acumen, in the circumstances of this case, Huntsman was the party with the

knowledge that, if the Limitation Clause is effective, TOK would not receive the benefit of its

bargain in the allocation of risk and the requirement that Huntsman timely notify TOK of any

manufacturing change. Huntsman also knew that TOK could not protect itself from a breach by

Huntsman of its obligation timely to notify TOK of a manufacturing change if the change

resulted in a latent defect in the PG. Without such notice by Huntsman and if the PG otherwise

passed TOK's tests, TOK did not have the knowledge or ability to avoid the resultant harm. "If

there is a type of risk allocation that should be subjected to special scrutiny, it is probably the

shifting to one party of a risk that *only* the other party can avoid." Eddy, *Metaphysics*, 65 Cal. L.

Rev. at 47 (emphasis in original). Under Huntsman's argument, that would be the effect of the

Limitation Clause, and such a shifting of risk fails under the scrutiny of procedural

unconscionability.

### d. Genuine consent

There also was no genuine consent on the part of TOK to the Limitation Clause acting as

a damages limitation in the event Huntsman breached its obligation timely to notify TOK of any

change in Huntsman's manufacturing process. The parties negotiated that obligation by

Huntsman two years after the Credit Application was signed, and in those negotiations the

parties agreed to limit Huntsman's liability for nonconforming goods for which TOK could test.

There is no evidence of TOK's consent to shift the risk of harm that only Huntsman could

avoid—a breach of Huntsman's obligation timely to notify TOK of any manufacturing change

and a resultant undiscoverable defect.

### 2. Substantive Unconscionability

If the Limitation Clause were evaluated as of the time the Credit Application was

executed, there is little doubt that it would not be substantively unconscionable. Commercial

parties regularly limit liability for consequential damages.

Huntsman argues that for cases involving only economic damages, the Court must evaluate unconscionability for purposes of Section 2-719(3) at the time the contract was formed, and that post-formation facts are only relevant in cases involving personal injury. Huntsman's reading of Section 2-719(3) is misguided. The only difference between economic injury and personal injury in an unconscionability analysis under Section 2-719(3) is that a limitation of consequential damages where there is an injury to the person is prima facie unconscionable, whereas a limitation of damages where the loss is commercial is not prima facie unconscionable. Nothing in the language of Section 2-719(3) or its official comments supports the argument that post-formation facts are only relevant to an unconscionability analysis where there is a personal injury. The analytical difference between personal and economic injury established in Section 2-719(3) involves merely the burden of proving a prima facie case of unconscionability, not the relevant timeframe or facts that a court should consider.

Huntsman also argues generally that under Section 2-719(3) a court is constrained to only look to the facts at the time of contract formation. The genesis of Huntsman's argument is a conflation between Section 2-719(3) and Section 2-302(1), which expressly states that unconscionability under that section is considered "at the time [the contract] was made." U.C.C. § 2-302(1). Section 2-302(1) is a broad provision establishing the test for considering whether any clause in a contract is unconscionable. Section 2-719(3), however, is a specific provision applying only to a limitation of consequential damages and does not contain the requirement contained in Section 2-302(1) that the unconscionability analysis be as of the time of the contract's formation. If the requirement that unconscionability for limitations on consequential damages be analyzed at the time of contract formation was intended, the same language used in Section 2-302(1) could easily have been included in Section 2-719(3). The Court gives meaning

to the difference in language between the two provisions, and to the official comment explaining that Section 2-719(3) "makes it clear" that clauses limiting or excluding consequential damages "may not operate in an unconscionable manner." U.C.C. § 2-719 cmt. 3. Huntsman's reading of Section 2-719(3) is counter to the official comment and renders meaningless the difference in language between Sections 2-719(3) and 2-302(1) and is rejected by the Court.

Huntsman cites to several cases in support of its argument. These cases either similarly conflate Section 2-719(3) and 2-302(1), or are primarily addressing other issues relating to unconscionability and comment only in dicta the timeframe for an unconscionability analysis.

Huntsman first relies on *Lindeman v. Eli Lilly & Co.*, 816 F.2d 199 (5th Cir. 1987). The Fifth Circuit in *Lindeman* held that the district court erred in its *sua sponte* finding on the eve of submitting the case to the jury that the consequential damages limitation was unconscionable because unconscionability was never raised by the plaintiff and no evidence of unconscionability was submitted by the plaintiff. *Id.* at 203. The Fifth Circuit noted that a court must have evidence of unconscionability before it can support a finding of unconscionability and that a defendant must be given fair notice that a portion of its contract will be challenged as unconscionable. *Id.* The court then went on to note that the trial court's finding of unconscionability did not comport with UCC Section 2-302(1). *Id.* The court in *Lindeman* cited to Section 2-719(3) for the proposition that a prima facie case of unconscionability is automatically found only when there is an injury to the person, and that the district court's *ad hoc* finding of facial unconscionability where only economic damages were involved was not reconcilable with the provision's distinction between personal and economic injury for facial unconscionability. Notably, the court discussed that the function of a consequential damages limitation was risk allocation, and that the limitation at issue in the case "abundantly" filled that purpose because many of the uncertainties

that might cause the plaintiff to suffer damages were "uniquely within the control" of the

plaintiff. *Id.* at 204. The reverse is true in this case, however, because the knowledge and

uncertainty causing the risk of harm that occurred here was uniquely in control of Huntsman, the

defendant.

Huntsman also cites to *Bray*, 2005 WL 6792280, at *6. Huntsman reads too much into

*Bray*. *Bray* analyzed whether there is a separate "bad faith" test for unconscionability and quoted

Section 2-302(1) for the proposition that unconscionability is considered as of the time of a

contract's formation. *Bray* did not discuss the textual differences between Section 2-302(1) and

Section 2-719(3) or the official comment to Section 2-719.

Finally, Huntsman relies on *In re Dornier Aviation (N. Am.), Inc.*, 2005 WL 3783829,

at *6 (Bankr. E.D. Va. Dec. 30, 2005). Huntsman quotes *Dornier's* statement that Section 2-

719(c) is retrospective and looks to the time of contract formation. *Dornier*, however, cites to

Section 2-302(1) for that proposition. As in *Bray*, the court in *Dornier* relied on Section 2-302(1)

without discussing the difference in language between Section 2-302(1) and Section 2-719(3) or

the official comment to Section 2-719.

The Court finds that in the context of Section 2-719(3), the Court is instructed by the

UCC to consider whether the damages limitation *operates* in an unconscionable manner, which

requires consideration of post-formation facts. Limiting TOK's damages for Huntsman's breach

of its obligation timely to notify TOK of any manufacturing changes would operate in such an

unconscionable manner.

Because the knowledge and ability to avoid the harm caused by a change by Huntsman in

its manufacturing process was solely Huntsman's and the parties did not expressly and

consciously allocate that risk to TOK, it is fundamentally unfair to enforce the Limitation Clause.

Additionally, because the Court has found that a refund of the purchase price deprives TOK of the substantial value of its bargain and does not provide an adequate remedy under the specific circumstances presented, "the exclusion of incidental and consequential damages renders the available damages unconscionably low." *Viking Yacht I*, 2007 WL 2746713, at * 7. Accordingly, the Limitation Clause, under the specific circumstances of this case, operates in a substantively unconscionable manner.[9]

## CONCLUSION

Under the specific circumstances presented in this case, the Limitation Clause in the Huntsman General Terms fails of its essential purpose and is procedurally and substantively unconscionable; it is, therefore, unenforceable. Accordingly, TOK's motion for partial summary judgment (Dkt. 34) is GRANTED, and Huntsman's motion for partial summary judgment (Dkt. 33) is DENIED.

**IT IS SO ORDERED**.

DATED this 8th day of August, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[9] In addition to the exclusive refund remedy failing of its essential purpose, for the same reasons that the Court finds that the consequential and incidental damages limitation is unconscionable, the Court finds that the refund remedy limiting damages to the purchase price also is unconscionable.